UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DIARBRO L. WILLIAMS,

                    Plaintiff,

          v.                                    Case No. 20-cv-504-pp

SERGEANT HESTHAVEN,
and NURSE MICHELLE,

                    Defendants.

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 70), DENYING DEFENDANT NURSE MICHELLE SKROCH'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 75) AND DENYING DEFENDANT CORY HESTHAVEN'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 81)**

          Diarbro L. Williams, who is representing himself and who was incarcerated at the time he filed this lawsuit, is proceeding under 42 U.S.C. §1983 on Eighth Amendment claims against Sergeant Cory Hesthaven[1] and Nurse Michelle Skroch at the Racine County Jail. The plaintiff has moved for summary judgment against Sergeant Hesthaven, dkt. no. 70, which Sergeant Hesthaven opposes, dkt. no. 90. Each defendant also has moved for summary judgment, dkt. nos. 75, 81, which the plaintiff opposes, dkt. no. 88. The court concludes that there are genuine issues of material fact precluding the entry of summary judgment for any party.

---

[1] The plaintiff sued the Sergeant as "Sgt. Hestheaven." Dkt. No. 1. The sergeant's answer uses the spelling "Heasthaven," dkt. no. 26, but his motion for summary judgment and supporting materials use the spelling "Hesthaven." Dkt. Nos. 81– 84. The court will use the defendant's most recent spelling (Hesthaven). The court presumes that all references to Sergeant "Hestheaven" or "Heasthaven" are to the same person.

1

## I. Facts

### A. Procedural Background

The plaintiff filed his complaint on March 30, 2020. Dkt. No. 1. The court screened the complaint and allowed the plaintiff to proceed on two Eighth Amendment claims: 1) that Sergeant Hesthaven used unnecessary and excessive force on the plaintiff and 2) that Nurse Michelle was aware of the plaintiff's serious medical issue but refused to treat it. Dkt. No. 20 at 7.

On January 22, 2021, the court issued a scheduling order informing the parties of the applicable federal and local rules governing motions for summary judgment and provided a copy of the rules. Dkt. No. 38 at 2–3, 5–11. The scheduling order set a February 22, 2021 deadline for the defendants to file motions for summary judgment on the ground the plaintiff failed to exhaust the available administrative remedies. Id. at 2. At that deadline, Sergeant Hesthaven moved for an extension of time, citing the ongoing COVID-19 pandemic, reduced staffing levels at Racine County's Office of Corporation Counsel and "a larger-than-usual volume of record requests." Dkt. No. 41; Dkt. No. 42 at ¶¶4–5; Dkt. No. 43 at ¶¶4–6; Dkt. No. 44 at ¶6. Nurse Michelle moved to join the request for an extension of time. Dkt. No. 47. The court granted the motions and extended the deadline for filing motions for summary judgment based on exhaustion to April 21, 2021. Dkt. No. 48. Neither defendant filed an exhaustion-based summary judgment motion by or after that deadline.

The scheduling order also set a July 22, 2021 deadline for the parties to file merits-based summary judgment motions. Dkt. No. 38 at 2. On July 2, 2021, the court received from the plaintiff a motion for summary judgment against Sergeant

2

Hesthaven. Dkt. No. 70. Both defendants filed their motions for summary judgment on the merits at the July 22, 2021 deadline. Dkt. Nos. 75, 81.

B.    Factual Background

From the time he filed his complaint until September of 2021, the plaintiff was incarcerated at Green Bay Correctional Institution. Dkt. No. 73 at ¶1. But at the time of the events alleged in his complaint, he was housed at the Racine County Jail. Dkt. No. 1 at 3; Dkt. No. 82 at ¶1. At the time of the events described in the complaint, Sergeant Hesthaven worked as a sergeant at the jail. Dkt. No. 82 at ¶2. Nurse Michelle is a registered nurse employed by MEnD Correctional Care, PLLC, and was assigned to the jail in January 2020. Dkt. No. 79 at ¶¶3–4.

1.    *Sergeant Hesthaven*

In the evening on January 2, 2020, an inmate in holding cell 1 at the jail began to cause a disturbance. Dkt. No. 82 at ¶3. Several other inmates inside the cell were standing at the glass or door area of the cell. Id. at ¶4. In his complaint, the plaintiff alleged that the disruptive inmate was asking Correctional Officer Teeling (not a defendant) for a blanket, and alleged that the officer did not give him one. Dkt. No. 1 at 3.[2] The inmate became upset, kicked the door of the cell and called the officer a "bitch." Id.; Dkt. No. 91 at ¶3. Sergeant Hesthaven states that Teeling attempted to deescalate the situation by asking the inmates to back away from the glass of the cell. Dkt. No. 82 at ¶5; Dkt. No. 84 at ¶9. Hesthaven avers that he also instructed the inmates to stand back "in an attempt to

_____

[2] Because the plaintiff's complaint is verified, the court treats it as "the equivalent of an affidavit" for purposes of this decision. See Devbrow v. Gallegos, 735 F.3d 584, 587 (7th Cir. 2013); Ford v. Wilson, 90 F.3d 245, 246–47 (7th Cir. 1996).

deescalate the situation and maintain discipline." Dkt. No. 82 at ¶6; Dkt. No. 84 at ¶10. The plaintiff disputes that Teeling attempted to deescalate the situation and alleges that the officer disrespected the inmate by "talking to him as he was a baby saying 'owe you lonely, baby need a blanket.'" Dkt. No. 89 at ¶5; Dkt. No. 72 at ¶3. In support he cites "[T]eeling body cam.," dkt. no. 89 at ¶5, but there is no video exhibit or body-camera footage in the record.

Hesthaven instructed the inmates that if they did not comply with his orders, he would use Oleoresin Capsicum ("OC") spray. Dkt. No. 82 at ¶7; Dkt. No. 84 at ¶10. Hesthaven avers that the inmates did not comply with his orders, so he "deployed OC spray underneath the door to holding cell 1 for approximately three seconds." Dkt. No. 82 at ¶8; Dkt. No. 84 at ¶11. He says he deployed the spray intending "to quell the disturbance inside the cell and protect the other inmates in the cell." Dkt. No. 84 at ¶12; Dkt. No. 82 at ¶8.

The plaintiff asserts that the inmates complied with Hesthaven's orders to back away from the door, but that Hesthaven sprayed OC spray into the cell "anyway for no reason." Dkt. No. 89 at ¶6. He again cites only the body-camera footage in support; as noted, he did not provide the court with any such footage. Id. But the plaintiff states in his complaint that Hesthaven used the spray "for no reason" and that the disruptive inmate "didn't present a threat of immediate harm to himself or others." Dkt. No. 1 at 3. The plaintiff also filed a statement from Hunter Hanson, another inmate who was in cell 1 at the time. Dkt. No. 72-1 at 2. Hanson corroborates the plaintiff's statement that Hesthaven "out of nowhere without warning . . . sprayed pepper spray under the [d]oor for no reason." Id.

4

The plaintiff also attached Teeling's report of the incident. Dkt. No. 72-1 at 3. The report largely corroborates the parties' description of the events. It states that in the evening on January 2, 2020, inmate Darryl Nunn asked Teeling for a blanket. Id. Teeling says staff had told Nunn that the blankets were being washed and that he would receive one before bedtime. Id. Nunn complained that state law required he receive a blanket upon his entry into the jail. Id. When he did not receive a blanket, Nunn kicked the cell door. Id. Teeling warned Nunn "that if he escalated the situation he would [be] moved to a different cell." Id. Nunn became argumentative, so Teeling instructed the inmates to move away from the window so she could remove Nunn from the cell. Id. Hesthaven arrived at the cell door and told the inmates to back away from the glass. Id. He then deployed OC spray into the cell. Id. Teeling ordered the inmates to back up to the back wall so staff could open the cell door. Id. Numerous officers and deputies arrived, entered the cell, secured Nunn with handcuffs and took him to another cell. Id.

After removing Nunn, officers evacuated and decontaminated the cell. Dkt. No. 82 at ¶9; Dkt. No. 84 at ¶14. Officers allowed the inmates to shower and provided them clean jail uniforms. Dkt. No. 82 at ¶10; Dkt. No. 72-1 at 3. An inmate worker cleaned the cell, and staff brought a fan to circulate the air within the cell. Dkt. No. 72-1 at 4. The officers also allowed the inmates to see medical staff for any lingering issues. Dkt. No. 82 at ¶11; Dkt. No. 72-1 at 3. The plaintiff asked for medical attention and saw Nurse Michelle that evening. Dkt. No. 82 at ¶12. Hesthaven avers that the plaintiff did not notify him of any health concern he was experiencing. Dkt. No. 84 at ¶15.

The plaintiff asserts that Hesthaven directed the OC spray "at everybody" even after the inmates complied with his orders to back away from the glass. Dkt. No. 89 at ¶14. He cites no evidence in support of that fact—not even his own declaration—and he testified during his deposition that Hesthaven *did not* direct the OC spray at him but directed it only at inmate Nunn. Dkt. No. 85-2 at 30:2–6. The plaintiff testified that being subject to the OC spray caused his chronic headaches to occur more frequently than before. Id. at 55:11–18. He testified that pain medication sometimes helped, but "a lot of times [he'd] just have to lay down and put a cold towel over [his] head." Id. at 55:19–22.

Sergeant Hesthaven states that the jail makes the Inmate Handbook available to all inmates. Dkt. No. 82 at ¶15; Dkt. No. 84 at ¶5. The plaintiff says he never saw the Handbook while in the jail but does not dispute that the jail makes it available to all inmates. Dkt. No. 89 at ¶15. The Handbook details the jail's policy for inmate grievances and appeals. Dkt. No. 82 at ¶16; Dkt. No. 84-1 at 3–4. It provides that inmates first must attempt to resolve their grievance informally with a staff member. Dkt. No. 84-1 at 3. If that does not resolve the issue, the inmate may file a formal grievance using an "Inmate Request" form, which is available on every housing unit. Id. The inmate must sign the grievance and file it within seven calendar days of the incident. Id. at 4. A jail sergeant reviews the grievance, determines whether it has any merit and responds to the inmate with fourteen calendar days. Id. at 3–4. An inmate may appeal the sergeant's decision to the jail captain within seven days of the response, and the captain will review the appeal and respond to the inmate. Id. at 3–4. If an inmate

is released while the grievance is pending, he has seven calendar days to request a written response. Id.

On January 3, 2020, the plaintiff filed a grievance with the jail about the use of OC spray on January 2, 2020. Dkt. No. 82 at ¶17; Dkt. No. 84-2. This grievance recounts the incident, including Hesthaven's use of the OC spray. Dkt. No. 84-2. The grievance alleges that all inmates in the cell "got punish[ed] and suffer[ed] from the spray for no reason." Id. The grievance does not allege that the plaintiff suffered any injury or medical issue from the spray, including a headache. Id.

The plaintiff filed a second grievance about the incident on January 5, 2020. Id. at ¶18; Dkt. No. 84-2. This grievance again recounts the events from January 2, 2020, including Hesthaven's use of the OC spray. Dkt. No. 84-2. The grievance alleges that the use of the spray "punish[ed] everyone instead of getting that person out of the cell and taking him to the hole. Everyone has to suffer for his actions." Id. The grievance requests that the jail "look into this issue." Id. This grievance, like the first one, does not allege that the plaintiff suffered any injury or medical issue from the spray. Id.

The plaintiff never received a response to either grievance, but neither did he contact the jail requesting a response after he was transferred back to prison. Dkt. No. 82 at ¶26. He testified that he wrote to the Racine County Sheriff about the grievances "maybe, like, five, six months" after the January 2, 2020 incident. Id.; Dkt. No. 85-2 at 59:15. Hesthaven avers that there is nothing in the plaintiff's jail file suggesting that the jail received an additional written request or inquiry from the plaintiff about the January 2, 2020 incident. Dkt. No. 82 at ¶27; Dkt.

7

No. 84 at ¶19. The plaintiff disputes this and states that he "wrote to the sheriff's office two times." Dkt. No. 89 at ¶27. He cites no evidence in support of this contention.

### 2. *Nurse Michelle*

The plaintiff saw Nurse Michelle for treatment at approximately 8:30 p.m. on January 2, 2020. Dkt. No. 79 at ¶13; Dkt. No. 77-1. She took the plaintiff's vital signs, which did not show he had a medical condition requiring additional treatment. Dkt. No. 79 at ¶¶14–15; Dkt. No. 77 at ¶¶5–6. The plaintiff did not exhibit signs of distress or shortness of breath. Dkt. No. 79 at ¶16; Dkt. No. 77-1. Nurse Michelle advised the plaintiff to return to his cell, hydrate, rest and follow-up if needed. Dkt. No. 79 at ¶17; Dkt. No. 77-1. Nurse Michelle's notes do not mention that the plaintiff complained about a headache. Dkt. No. 77-1; Dkt. No. 82 at ¶20. She avers that the plaintiff did not inform her that he had a headache, did not tell her he suffers from chronic headaches and did not request medication for his headaches. Dkt. No. 79 at ¶18; Dkt. No. 77 at ¶10. She states that if the plaintiff had complained of a headache or requested medication, she would have assessed his condition and documented his request in her nursing note. Dkt. No. 79 at ¶¶19–20; Dkt. No. 77 at ¶¶11–12.

The plaintiff disputes Nurse Michelle's statement that he did not tell her about his headache and history of headaches. Dkt. No. 94 at ¶18. Although he does not cite any evidence in support of his dispute, he swears in his declaration filed in support of his motion for summary judgment that he explained to Nurse Michelle his "history of severe headac[hes] and passing out and [he] told her the chemical agents trigger [his] head to hurt and [he] wasn't feeling well." Dkt. No.

72-1 at 1. He states that Nurse Michelle told him "to buy tylenol off canteen" and refused to treat his headache. Id. The plaintiff says he requested "sumatripan [sic]," which he says "is a medication to help with [his] headac[he]." Id. He reiterates that Nurse Michelle "just walked off without treating [him]." Id. The plaintiff resubmitted this declaration in response to Nurse Michelle's motion for summary judgment. Dkt. No. 95. His declarations mirror the allegations that he made in his complaint against Nurse Michelle. Dkt. No. 1 at 4.

The plaintiff testified that he has a long history of headaches. Dkt. No. 78-2 at 8:1–9. He testified that the OC spray used on January 2, 2020 caused him to choke and feel dizzy and his eyes to burn. Id. at 29:21–30:1. He testified that the headache he experienced on January 2, 2020 was consistent with the type and severity of headaches he experienced before the incident. Id. at 41:5–10, 42:4–7. He described the pain he experienced as "a seven, maybe eight" on a scale of zero to ten. Id. at 41:18–42:3. But he testified that his headache resolved by the next morning. Id. at 45:3–7. The plaintiff asserted that if Nurse Michelle had given him his headache medication, he "wouldn't have went through as much pain as [he] was going through." Id. at 48:13–15. He agreed with defense counsel that his only allegation against Nurse Michelle is that he "ended up experiencing a headache for a longer period of time than [he] would have if she had given [him] medication." Id. at 48:16–19. He also agreed that he is not asserting he sustained a permanent injury because of Nurse Michelle's care. Id. at 56:2–5.

The plaintiff testified that he has not spoken with any nurse or doctor who would testify that Nurse Michelle provided him negligent or substandard care. Id. at 49:18–50:3. He testified that he has no witnesses who will testify in support of

his claim against Nurse Michelle. Id. at 50:4–7. The plaintiff conceded that no doctor ever has told him that the OC spray deployment triggered his headache on January 2, 2020. Id. at 54:1–4, 55:2–5.

## II. Discussion

### A. Summary Judgment Standard

A party is entitled to summary judgment if the party shows that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. A party must support its factual disputes by citing evidence in the record or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). The court may deem admitted any facts that the parties do not properly contest by citing evidence in the record. See Civil Local Rule 56(b)(4) (E.D. Wis.); Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003). But the court "in its discretion may choose to search the record for additional evidence" that supports a factual disagreement, even if the parties have not cited that evidence. Menier v. Thompson, 85 F.3d 631, at *1 (7th Cir. 1996) (unpublished disposition).

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a

10

non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005). The court must "examine all of the evidence in the record to determine whether a reasonable juror could [find] in favor of the non-moving party." Sarkes Tarzian, Inc. v. U.S. Tr. Co. of Fla. Sav. Bank, 397 F.3d 577, 581 (7th Cir. 2005)

B.      Exhaustion

Before addressing the merits, the court addresses Hesthaven's argument that the court should dismiss the case because the plaintiff failed to exhaust his administrative remedies before filing his complaint. Dkt. No. 83 at 6–8. Under the Prison Litigation Reform Act, an inmate cannot bring a cause of action under federal law "until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a); see Woodford v. Ngo, 548 U.S. 81, 93 (2006). But failure to exhaust is an affirmative defense, and the defendants "have the burden of pleading and proving the defense." Massey v. Helman, 196 F.3d 727, 735 (7th Cir. 1999) (citing Williams v. Runyon, 130 F.3d 568, 573 (3d Cir. 1997)). This affirmative defense "is likely to be lost" if the defendants do not timely assert it, such as by allowing "administrative and judicial claims [to move] forward simultaneously and at the end of the judicial proceeding." Perez v. Wis. Dep't of Corr., 182 F.3d 532, 536 (7th Cir. 1999) (noting that §1997e(a) "can function properly only if the judge resolves disputes about its application before turning to any other issue in the suit").

Hesthaven says he "asserted failure to fully exhaust administrative remedies as an affirmative defense" in his answer to the complaint, which he filed

on November 18, 2020. Dkt. No. 83 at 7 n.1 (citing Dkt. No. 26). But the court ordered the defendants to file exhaustion-based summary judgment motions by February 22, 2021. Dkt. No. 38 at 2. The court granted Hesthaven's motion to extend that deadline to April 21, 2021. Dkt. No. 48. Despite the extension of time, neither defendant sought an additional extension of this deadline, and neither filed an exhaustion-based summary judgment motion by April 21, 2021.

Hesthaven gives no reason why he did not file an exhaustion-based summary judgment motion by the court-imposed deadline. He may have *raised* the defense in his answer, but he failed to comply with the deadline for *pleading and proving* that defense. He disregarded the deadline, even after the court granted his request to extend it, and now seeks to proceed on the exhaustion defense simultaneously with his motion on the merits of the plaintiff's claims. That is improper. See Perez, 182 F.3d at 536. The court will not allow him to belatedly raise exhaustion as an affirmative defense together with his motion for summary judgment on the merits. See Lipinski v. Castaneda, 830 F. App'x 770, 772 (7th Cir. 2020) (quoting McCurry v. Kenco Logistics Servs., LLC, 942 F.3d 783, 787 (7th Cir. 2019)) (noting that the Seventh Circuit has "repeatedly held that district judges may strictly enforce local summary-judgment rules"); see also Kyles v. Trunnell, No. 18-cv-2003-WED, 2020 WL 6149706, at *3 (E.D. Wis. Oct. 20, 2020) (denying defendants' request to raise an additional argument in favor of their previously denied motion for summary judgment on exhaustion grounds); Bowman v. Korte, 962 F.3d 995, 997–98 (7th Cir. 2020) (cited in Kyles, 2020 WL 6149706, at *3) (vacating judgment and rejecting the defendants' motion for summary judgment on exhaustion grounds filed after the court denied their

previous motion for summary judgment, two years after the court-imposed deadline and two months before trial).

If Hesthaven wanted to defend this lawsuit on the ground that the plaintiff failed to exhaust his administrative remedies, he needed to do so by the April 21, 2021 deadline. Because he provides no explanation for his failure to abide by that deadline, the court will not further address this issue or decide whether the plaintiff failed to exhaust his administrative remedies before filing this lawsuit.

C.     Sergeant Hesthaven

The court analyzes the plaintiff's claim that Hesthaven used excessive force under the Eighth Amendment, which protects a convicted, incarcerated person from cruel and unusual punishments. See generally Wilson v. Seiter, 501 U.S. 294 (1991). "[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Hudson v. McMillian, 503 U.S. 1, 5 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). An Eighth Amendment claim consists of an objective and subjective component. Farmer v. Brennan, 511 U.S. 825, 834 (1994). In the context of a claim of excessive force, the plaintiff must establish both that (1) "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation," and (2) "'the officials act[ed] with a sufficiently culpable state of mind.'" Hudson, 503 U.S. at 8 (quoting Wilson, 501 U.S. at 298, 303). A prison official may be held liable if he acts "in 'deliberate or reckless disregard' of plaintiff's right to be free from excessive use of force against him." Jackson v. Gerl, 622 F. Supp. 2d 738, 750 (W.D. Wis. 2009) (quoting Miller v. Smith, 220 F.3d 491, 495 (7th Cir. 2000)). The "core judicial inquiry" is "whether force was applied in a good-

faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 6 (citing Whitley, 475 U.S. at 320–21).

The court must consider several factors in determining whether a use of force was necessary or excessive. See Hudson, 503 U.S. at 7. These factors include "the need for force, the amount of force used, the threat reasonably perceived by the officer, efforts made to temper the severity of the force, and the extent of the injury caused by the force." Lewis v. Downey, 581 F.3d 467, 477 (7th Cir. 2009) (citing Whitley, 475 U.S. at 321, and Fillmore v. Page, 358 F.3d 496, 504 (7th Cir. 2004)).

It is undisputed that on January 2, 2020, inmate Nunn became argumentative and disruptive in cell 1. It is undisputed that Hesthaven approached the cell and told the inmates to back away from the glass. The parties dispute whether the inmates complied with Hesthaven's order, but they agree that Hesthaven sprayed OC spray into the cell shortly after telling the inmates to back up. Hesthaven avers that he used the OC spray "to quell the disturbance inside the cell and protect the other inmates in the cell." Dkt. No. 84 at ¶12. The plaintiff disputes Hesthaven's stated reasons for using the spray. But the plaintiff does not have personal knowledge of Hesthaven's state of mind when he used the OC spray, and the plaintiff cites no record evidence at odds with the sergeant's declaration. The plaintiff's speculation about Hesthaven's state of mind or intent, without supporting evidence elsewhere in the record, does not create a genuine dispute of fact that may defeat summary judgment. See Payne v. Pauley, 337 F.3d 767, 772 (7th Cir. 2003) (citing Fed. R. Civ. P. 56(e) (now Rule 56(c)(4)) and Fed. R. Evid. 602). The plaintiff also testified that Hesthaven did not direct the OC

spray at him and instead directed it at Nunn—the disgruntled inmate. Dkt. No. 85-2 at 30:2–6. It is therefore undisputed that Hesthaven did not use the OC spray with the intent to cause harm to the plaintiff.

But it *is* disputed whether the situation confronting Hesthaven warranted his use of OC spray at all. The plaintiff asserts that Hesthaven sprayed OC spray into cell 1 without warning and for no reason. The plaintiff states in his complaint that Nunn "was not presenting a threat of immediate harm to himself or others." Dkt. No. 1 at 3. He states that the inmates in the cell were calm and not combative, complied with Hesthaven's orders and backed away from the door, yet Hesthaven still used the OC spray. Dkt. No. 72 at 2; Dkt. No. 72-1 at 1. Inmate Hunter Hanson, who also was in cell 1 at the time, corroborates the plaintiff's version and states that Hesthaven "out of nowhere without warning . . . sprayed pepper spray under the [d]oor for no reason." Dkt. No. 72-1 at 2.

If the plaintiff's version is correct, a factfinder could determine that Hesthaven's perception of the threat posed by the inmates in the cell was unreasonable, that the used of the OC spray was unreasonable, that he could or should have tried to temper the amount of force he used and that the use of the spray was not necessary to remove Nunn from the cell. Viewing the facts in the light most favorable to the plaintiff as the non-moving party, Hesthaven's actions straddle the line between reckless—which could constitute a constitutional violation—and negligent or grossly negligent—which would not. See Chapman v. Keltner, 241 F.3d 842, 845 (7th Cir. 2001) (noting that "[n]either negligence nor even gross negligence is a sufficient basis for liability"); Jackson, 622 F. Supp. 2d at 750 (quoting Miller, 220 F.3d at 495) (noting that liability under §1983 may

attach when a prison official acts "in 'deliberate or reckless disregard' of" a plaintiff's right to be free from excessive force). A reasonable jury could reach either conclusion, depending on its credibility determinations of various witnesses and the totality of the evidence.

The final factor to consider is whether the plaintiff suffered a "harmful enough" injury to sustain a constitutional violation. Hudson, 503 U.S. at 8. The injury the plaintiff sustained need not be severe, but it must be more than "de minimis" or "minor." Id. at 9–10. The plaintiff stated in his complaint that the spray burned his throat and eyes, caused him to choke and aggravated his chronic headache condition. Dkt. No. 1 at 3–4. He stated that his head "hurt really bad" and "he wasn't feeling good." Id. at 4. He testified at his deposition that the spray caused him to choke and his eyes to water. Dkt. No. 85-2 at 30:7–9. He described the pain from the headache as "a seven, maybe eight" on a scale of zero to ten. Id. at 41:18–42:3. The plaintiff conceded that no doctor ever had told him that the OC spray triggered his headache on January 2, 2020. Id. at 54:1–4, 55:2–5. But he testified that he now experiences headaches more frequently. Id. at 55:11–18. He testified that pain medication sometimes helps, but that often he must lie down and place a cold towel on his head. Id. at 55:19–22.

Although a doctor has not diagnosed his headaches, the plaintiff testified that he experienced at least moderate pain after being sprayed and now experiences headaches more frequently than before the January 2, 2020 incident. If a jury concludes that Hesthaven's use of force was wanton and unnecessary, it

also could conclude that the plaintiff suffered more than a minor injury from the OC spray.

The court will deny both the plaintiff's and defendant Hesthaven's motions for summary judgment on this claim. A jury must decide both elements of this Eighth Amendment claim. See Riccardo v. Rausch, 375 F.3d 521, 526 (7th Cir. 2004) (noting that whether the plaintiff satisfies "the objective and subjective components of the eighth amendment . . . [is] for the jury in the first instance").

D.    Nurse Michelle

The court reviews the plaintiff's claim against Nurse Michelle under the Eighth Amendment, which "protects prisoners from . . . grossly inadequate medical care." Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 105 (1976). To prove that Nurse Michelle violated his rights under the Eighth Amendment, the plaintiff must present evidence establishing that he suffered from "'an objectively serious medical condition'" and that Nurse Michelle "'was deliberately, that is subjectively, indifferent'" to that condition. Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 662 (7th Cir. 2016) (quoting Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008)). A prison official shows deliberate indifference when she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837).

The plaintiff states in his complaint that he told Nurse Michelle about his history of headaches, told her that the OC spray triggered his headache and asked her for headache medication. Dkt. No. 1 at 4. He reiterates that account in his declaration in support of his motion for summary judgment, dkt. no. 72-1, which he resubmitted with his materials opposing Nurse Michelle's motion for summary judgment, dkt. no. 95. Nurse Michelle asserts the plaintiff's declaration cannot defeat summary judgment because it contains only "self-serving statements . . . without any other factual support in the record." Dkt. No. 99 at 4. She cites Buie v. Quad/Graphics, Inc., 366 F.3d 496, 504 (7th Cir. 2004), and Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001), which suggest that "self serving" evidence cannot create a material factual dispute. Although the Seventh Circuit has not directly overruled Buie, it *has* overruled Albiero and numerous of its prior cases "to the extent that they suggest a plaintiff may not rely on 'self-serving' evidence to create a material factual dispute." Hill v. Tangherlini, 724 F.3d 965, 967 n.1 (7th Cir. 2013). The court explained that "[d]eposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving." Id. at 967. The court clarified that "the term 'selfserving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." Id.

Both the plaintiff's and Nurse Michelle's declarations are by their nature "self serving." That does not mean they are inadmissible or insufficient to create a factual dispute. The plaintiff has personal knowledge about what he avers he told Nurse Michelle about his headaches and medication. Nurse Michelle avers that

the plaintiff told her none of those things. There is a genuine dispute of fact whether Nurse Michelle was subjectively aware of, but deliberately indifferent to, the plaintiff's headache. Summary judgment is not appropriate to resolve this issue. <u>See</u> <u>Payne</u>, 337 F.3d at 770 (citing cases for the proposition that "summary judgment cannot be used to resolve swearing contests between litigants").

The remaining question is whether there is a genuine dispute of fact that the plaintiff's headache was an objectively serious medical condition. Nurse Michelle "does not concede that [the plaintiff's] alleged headache presented an objectively serious medical condition." Dkt. No. 76 at 6. But she also does not assert that it *wasn't* an objectively serious medical condition. She asserts that the court need not address this element of the plaintiff's claim because the plaintiff did not provide sufficient evidence to satisfy the subjective element of a deliberate indifference claim. <u>Id.</u> The court has explained that it disagrees; it has concluded that the plaintiff provided sufficient evidence to create a genuine dispute of fact about the subjective element of his Eighth Amendment claim. That means the court *must* address the objective element.

The plaintiff testified that the headache he experienced after being sprayed was the same type and severity of headache he often experiences. Dkt. No. 78-2 at 41:5–10, 42:4–7. He described the pain from the headache as a seven or eight out of ten. <u>Id.</u> at 41:18–42:3. He testified that his headache lasted longer than it would have had Nurse Michelle provided him medication. <u>Id.</u> at 48:16–19.

"A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." <u>Arnett v. Webster</u>, 658 F.3d 742, 753

19

(7th Cir. 2011) (citing McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010)). The length of delay that is tolerable "'depends on the seriousness of the condition and the ease of providing treatment.'" Id. (quoting McGowan, 612 F.3d at 640). In certain circumstances, "even brief, unexplained delays in treatment may constitute deliberate indifference." Lewis v. McLean, 864 F.3d 556, 563 (7th Cir. 2017) (quoting Perez, 792 F.3d at 777–78).

Nurse Michelle mischaracterizes the plaintiff's claim as one "that he did not receive the 'proper' care." Dkt. No. 99 at 4. She asserts that without expert testimony, the plaintiff cannot prove that the care she provided "was negligent, much less deliberately indifferent." Id. But that is not the plaintiff's claim. The court allowed the plaintiff to proceed on a claim that "Nurse Michelle knew about [his] headaches and the fact that the plaintiff had a prescription for them, but deliberately *disregarded* the pain and the fact that there was a way to treat it." Dkt. No. 20 at 7 (emphasis added). The plaintiff does not need an expert witness to establish that he experienced a severe headache and that Nurse Michelle provided him *no* treatment despite being aware of his medical prescription. The plaintiff testified that his headache resolved by the next morning. But a jury could conclude that even that short window of suffering was intolerable because Nurse Michelle could have provided the medication. If a jury believes that version of the events, it also could conclude that Nurse Michelle's refusal to provide the plaintiff his headache medication unnecessarily prolonged his pain.

A reasonable jury could conclude that Nurse Michelle was subjectively aware of but refused to treat the plaintiff's objectively serious medical issue. The court therefore denies Nurse Michelle's motion for summary judgment.

### III. Conclusion

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 70.

The court **DENIES** Nurse Michelle Skroch's motion for summary judgment. Dkt. No. 75.

The court **DENIES** Sergeant Cory Hesthaven's motion for summary judgment. Dkt. No. 81.

The court will schedule a status conference to discuss the next steps in this case.

Dated in Milwaukee, Wisconsin this 10th day of February, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**